UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| YANKTON SIOUX TRIBE, a federally-recognized Tribe of Indians; MARTY INDIAN SCHOOL, a Tribal Grand School of the Yankton Sioux Tribe, FLANDREAU SANTEE SIOUX TRIBE, a federally-recognized Tribe of Indians; CHEYENNE RIVER SIOUX TRIBE, a federally-recognized Tribe of Indians; OGLALA SIOUX TRIBE, a federally-recognized Tribe of Indians; LONEMAN SCHOOL, a Tribal Grant School of the Oglala Sioux Tribe; PORCUPINE SCHOOL, a Tribal Grant School of the Oglala Sioux Tribe; WOUNDED KNEE DISTRICT SCHOOL, a Tribal Grant School of the Oglala Sioux Tribe; STANDING ROCK SIOUX TRIBE, a federally-recognized Tribe of Indians; TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, a federally-recognized Tribe of Indians; and LOWER BRULE SIOUX TRIBE, a federally-recognized Tribe of Indians, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civ.  06-4091  ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | |
| DIRKE KEMPTHORNE, Secretary, United States Department of Interior, or his predecessor-in-office; UNITED STATES DEPARTMENT OF INTERIOR; UNITED STATES BUREAU OF INDIAN AFFAIRS; JAMES CASON, in his official capacity as the Acting Assistant Secretary of Indian Affairs for the United States Department of Interior, or his successor in office; ED PARISIAN, in his capacity as Acting Director for the Office of Indian Education Programs, or his successor-in-office, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs, Indian Tribes and tribal grant schools, move for a preliminary injunction to prevent the closure of several Education Line Offices operated by the Office of Indian Education Programs (OIEP). Defendants oppose the motion.  Plaintiffs' motion for a preliminary injunction is granted.

## BACKGROUND

Plaintiffs are Indian Tribes or tribal schools operated under grants from the United States Bureau of Indian Affairs (BIA).  OIEP is the unit of the United States Department of Interior (DOI) that provides technical assistance, oversight, and funding to Indian schools run by the tribes and the BIA.  OIEP supervises the schools through its Education Line Offices, which are run by a mid-level field manager known as an Education Line Officer (ELO).  There are currently ELOs in Eagle Butte, Mission, Lower Brule and Pine Ridge, South Dakota, and Fort Yates and Belcourt, North Dakota.

Defendant Ed Parisian, acting director of OIEP, testified that OIEP has been considering the reorganization of ELOs throughout the region since 2003.  He claims that restructuring is necessary to manage the changes implemented by the No Child Left Behind Act of 2001, the change in the number of grant schools, and stagnant funding.  It is his opinion that the current organizational structure does not allow adequate oversight of the

2

ELOs.  Under the No Child Left Behind Act, OIEP is required to implement a standard academic assessment of all of its schools to determine whether the schools make adequate yearly progress.  Parisian alleges that only 7 of the 32 schools located in North and South Dakota are meeting the standards imposed by the No Child Left Behind Act.

In addition to the new accountability requirements imposed by the No Child Left Behind Act, Parisian alleges that restructuring is necessary to make the OIEP more efficient.  Parisian was the deputy director of OIEP in 2002.  He alleges that under the current structure, the deputy director of the OIEP is responsible for overseeing 23 ELOs and supervising 6 employees.  Parisian contends that by creating new senior management positions to whom the ELOs would report, management could better understand and control the field offices.  Parisian contends that it was impossible to understand what was happening at each field office, and that he was "always reacting to situations as opposed to being able to provide proactive solutions to potential problems that may arise."

Parisian further alleges that ELOs need to be reorganized to establish more uniform support to tribes and the tribal schools.  Under the current system, some ELOs only supervise a few schools while others supervise 17 schools.  Parisian contends that there are discrepancies in the training and salary of ELO employees and services offered by ELOs.  Parisian alleges that

restructuring would allow ELOs to provide an equal level of services to tribal schools.  Finally, Parisian contends that restructuring is necessary to meet the additional burdens which have been imposed by No Child Left Behind without an increase in funding.

In July of 2003, OIEP sent consultation packets to tribal leaders and other interested parties requesting comments on the realignment of ELOs and the No Child Left Behind Act.  The packet indicated that OIEP "is seeking input from tribes, communities, school boards and education personnel to assist in determining if realignment of ELO's is in order."  Def. Ex. A at 11.  OIEP reported that funding for the ELOs had been at the same level while its responsibilities had increased.  Id.  In August of 2003, OIEP held regional consultation meetings regarding the ELOs and other topics in eleven Western and Midwestern states, including one meeting in Aberdeen, South Dakota.  No specific plan was put forward at these meetings.

In March of 2004, OIEP sought comment on a more detailed plan to restructure its operations.  In April and May of 2004, OIEP held meetings to discuss the plan in New Mexico, Arizona, South Dakota, and Montana. Under the plan, 17 ELOs would be reorganized into four regional Lead Education Line Officers (LELOs) located in Aberdeen, South Dakota; Albuquerque, New Mexico; Gallup, New Mexico; and Phoenix, Arizona.  The education staff located at the Education Line Offices in Crow Creek and

Lower Brule, Pine Ridge, Rosebud, and Standing Rock would be consolidated into the new office in Aberdeen.

Parisian claims that the restructuring would improve OIEP by providing each ELO with a Deputy ELO.  Under the new plan, ELOs would have education specialists on staff who would provide improved services and schools with the greatest needs would have access to more services to meet the standards set by the No Child Left Behind Act.  Parisian contended that the reduction in the number of ELOs reporting on a daily basis to the deputy director from 22 to 9 would result in the deputy director having more time to spend with individual ELOs.

Parisian contends that the locations of the 9 ELOs in the 2004 plan were based on suggestions made during the 2003 consultation.  In public comments submitted to OIEP in 2004, most participants stated that they wanted the Education Line Offices in their communities to remain open. Parisian alleges that after these consultations, he attended informal consultation meetings in areas that would be affected by the restructuring, including Aberdeen, South Dakota.

In a letter to Acting Assistant Secretary for Indian Affairs James Cason dated April 20, 2005, Cheyenne River Sioux Tribe Chairman Harold Frazier expressed his opposition to the OIEP reorganization and closure of the Education Line Offices.  Frazier stated that the services provided by the

ELOs could not be replaced by employees in regional or headquarters positions, and he expressed his disappointment that OIEP had not consulted with tribal governments as mandated by Presidential Executive Order. He requested that OIEP: (1) consult with the tribes before implementing any reorganization or terminating any employees; (2) provide funding to keep the ELOs open and supplement the funding with Center for School Improvement funds; and (3) consider re-examining the special initiatives funding and programming some of those funds to the ELO positions. On June 14, 2005, the Cheyenne River Sioux Tribal Council adopted a resolution requesting that DOI stop the ELO restructuring process and meet and consult with tribal leaders.

In August of 2005, OIEP began another tribal consultation and requested written comments about the proposed reorganization. The BIA made a special request for comments on the following issues: (1) the proposal to create two associate deputy director positions to administer BIA run schools and create a third associate director position to administer tribal grant schools; (2) the validity of the rationale for restructuring; and (3) the location of the ELOs. Parisian contends that the number of ELOs was increased from 9 to 19 in response to comments made in the 2004 consultation.

6

On December 1, 2005, Parisian made his final recommendation to Cason to adopt a proposal for 19 ELOs.  The organizational chart indicates that South Dakota would have two ELOs, while North Dakota would have one, but the chart did not specify the towns in which the ELOs would be located.  Under the new plan, each ELO would have the same professional staff.

On December 22, 2005, OIEP informed tribal leaders that the agency had adopted a restructuring plan.  OIEP also asked the tribes to work with OIEP and the Office of Management and Budget to obtain funding necessary to achieve OIEP's goals.  OIEP proposed establishing 3 associate deputy director positions to supervise 19 ELOs.  In addition to the 19 ELOs, the plan provided for 7 new high-level positions,[1] including an Associate Deputy Director-EAST, K-12 Operations would be located in Pierre, South Dakota.  This director would supervise 6 ELOs, including the ELOs in Pierre and Rapid City, South Dakota, and Minot, North Dakota.  The stated goal of the

---

[1]Parisian referred to these 7 positions as "SES positions" and plaintiffs referred to them as "Senior Executive Positions."  At other points in the record, the associate deputy directors have been referred to as LELOs.  For the sake of clarity, the court will refer to all 7 of these positions as SES positions.  The new executive positions include a director for OIEP, a deputy director for K-12 school operations, 3 associate deputy directors to supervise ELOs and K-12 school operations, a deputy director for policy and post-secondary education, and an associate deputy director for post-secondary education.  See Letter from James Cason to Tribal Leaders, December 22, 2005,  Pl. Ex. 9.

restructuring was to improve communications, management, and accountability of the education program.

In March of 2006, the BIA advertised the opening of the ELO positions for hiring in Minot, Pierre, Rapid City, and other locations.  Applications were accepted from March 1 to March 22, 2006.  The ads indicated that qualified Indian candidates would be given preference in hiring.

In a letter to tribal leaders dated March 6, 2006, Parisian indicated that he had met with tribal leaders the previous week to hear their concerns about the number and location of ELOs.  He scheduled two conference calls for March 9, 2006, to discuss their concerns with the restructuring and hear their proposals for alternatives.  Parisian stated that "[w]e are on the cusp of taking action regarding the advertising of staff positions and the leasing of office space, so your views will be important in guiding our implementation efforts."  Parisian contends that based on the suggestions of tribal leaders, OIEP added an additional education specialist to the 3 ELOs located in North and South Dakota.

Parisian contends that a congressional committee approved reprogramming of $1.5 million from the 2006 OIEP budget for the restructuring.  Pending before the congressional committee is a request to reprogram $3.2 million in Early Childhood Development funds to pay for the restructuring.  OIEP has a  budget request pending before Congress for

$13,542,000 for Education Program Management in the 2007 budget, which is a net increase of $2.5 million. Parisian alleges that the $2.5 million increase will meet the staffing needs of the newly restructured program.

Plaintiffs filed a complaint against defendants and move for a preliminary injunction to prevent the closure of the existing ELOs pending resolution of their petition for a writ of mandamus and request for declaratory relief. Plaintiffs allege that the restructuring process violated several statutes, BIA policies and their right to equal protection. Plaintiffs contend that OIEP failed to meaningfully consult with the Tribes as required by statute and BIA policy. Plaintiffs contend that OIEP improperly spent funds appropriated for educational programs on administrative expenses and created new positions that Congress had not funded, in violation of federal law. Plaintiffs allege that OIEP is required to give first preference to rural areas when locating offices, which OIEP violated when it proposed shifting ELOs from rural communities to urban areas. Finally, plaintiffs contend that the proposed restructuring is arbitrary and capricious because it will merely create a new layer of bureaucracy rather than improve Indian education.

Defendants contend that they complied with the procedural requirements and that the merits of the program are committed to agency discretion and therefore not subject to judicial review.

9

On June 21, 2006, the parties stipulated that there was no immediate need for a TRO because the defendants agreed to refrain from hiring new personnel or entering into lease agreements as part of the restructuring plan until after July 14, 2006.  Defendants agreed that no additional personnel would be terminated until July 14, 2006.  Reduction in Force (RIF) notices that had already been issued do not take effect until August 1, 2006, for ELOs and August 14, 2006, for secretarial staff, business managers, and education specialists.

## DISCUSSION

When ruling on a motion for a preliminary injunction, the court must consider (1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction would inflict on other parties; (3) the likelihood of success on the merits; and (4) the public interest. Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981).

### 1.    Threat of Irreparable Harm

Among other allegations, plaintiffs contend that defendants failed to meaningfully consult with them before initiating the restructuring program. As explained in more detail below, federal law and BIA policy requires meaningful consultation before taking action that affects Indian schools.  If the restructuring occurs without meaningful consultation, plaintiffs will lose

10

a procedural right guaranteed by federal law and BIA policy.  The court finds that there is a threat of irreparable harm to the plaintiffs, which weighs in favor of granting a preliminary injunction.

## 2.     Injury to Other Parties

Defendants contend that if an injunction is issued, OIEP will be required to continue the employment of staff members that the restructuring eliminates.  Parisian testified that as part of the restructuring plan, defendants have issued RIF notices to special education coordinators, field education coordinators, and some ELOs in the Dakotas.  It is unclear whether any of these employees have actually stopped working as a result of the restructuring plan.  In addition, the opening and staffing of the new ELO offices would be delayed as would the closing of the old ELO offices. Funding for the 7 new SES positions will not be available until the 2007 appropriation, thus these positions have not been filled.  Finally, OIEP has submitted a request to Congress to reprogram $3.2 million for the restructuring, which would be unavailable if the restructuring is enjoined.

Although defendants would be harmed by an injunction, maintaining the status quo would cause minimal injury because the planned personnel actions and consolidation of ELOs has not occurred and the SES positions cannot be filled until Congress passes BIA's 2007 appropriation. Maintaining the current level of staffing and arrangement of offices is a

11

minor injury compared to the irreparable loss of procedural rights plaintiffs would suffer if the motion for preliminary injunction is denied. Accordingly, this factor weighs in favor of granting a preliminary injunction.

**3.      Success on the Merits**

The moving party need not demonstrate a mathematical probability of success, such as greater than 50 percent. <u>Heartland Academy Cmty. Church v. Waddle</u>, 335 F.3d 684 (8th Cir. 2003). Rather, the movant must have a "fair chance of prevailing" after discovery, formal procedures, complete evidence, and a full trial on the merits. <u>Id.</u>

Plaintiffs allege that OIEP failed to meaningfully consult with the Tribes as required by statute and BIA policy before adopting the restructuring plan. Defendants contend that the BIA complied with the consultation requirements, and that in any event, the decision to reorganize its management structure is committed to its discretion by law and therefore is not subject to judicial review.

**A.      Judicial Review**

"[A] basic presumption of judicial review of agency action is embodied in the APA." <u>Lincoln v. Vigil</u>, 508 U.S. 182, 190, 113 S. Ct. 2024, 124 L. Ed. 2d 101 (1993). In certain instances, however, agency action is deemed committed to agency discretion by law, and thus is unreviewable by the courts. <u>Id.</u> at 190-91. These discretionary actions include such matters as

whether to institute an enforcement action, Heckler v. Chaney, 470 U.S. 821, 832, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985), how to allocate funds from a lump-sum appropriation, Lincoln, 508 U.S. at 192-93, and whether to grant reconsideration of an action because of material error.  ICC v. Bhd. of Locomotive Engineers, 482 U.S. 270, 282, 107 S. Ct. 2360, 96 L. Ed. 2d 222 (1987).

Typically actions are committed to agency discretion where it is not possible to devise an adequate standard of review for an agency action. Ngure v. Ashcroft, 367 F.3d 975, 982 (8th Cir. 2004).  The judiciary may, however, in certain contexts review an agency's compliance with its own regulations when the regulations impose binding norms on the agency. Vitarelli v. Seaton, 359 U.S. 535, 539-40, 79 S. Ct. 968, 3 L .Ed. 2d 1012 (1959); Ngure, 367 F.3d at 982.  "As a general rule, an agency pronouncement is transformed into a binding norm if so intended by the agency[,] and agency intent, in turn, is ascertained by an examination of the statement's language, the context, and any available extrinsic evidence."  Id. (quoting Padula v. Webster, 822 F.2d 97, 100 (D.C. Cir. 1987)).  Judicial review is appropriate where agency rules were "intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion."  Am. Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 538-39, 90 S. Ct. 1288, 25 L. Ed. 2d 547 (1970).  When the procedural

13

rule is designed primarily to benefit the agency in carrying out its functions, however, judicial review may be prohibited.  Id. at 539.

The case at bar involves more than a challenge to a reallocation of funds from a lump sum appropriation.  Here, federal statutes and BIA policies require the BIA to consult with Tribes before making changes in Indian school programs.  See 25 U.S.C. § 2011(b)(1) & (2); 25 C.F.R. § 32.2(g); 25 C.F.R. § 32.4(a)(1) & (2); and BIA Consultation Policy.  The explicit language of these statutes, regulations, and policies indicates an intent to confer important procedural benefits upon the tribes in the face of agency discretion and thus the agency action is subject to judicial review.  See, e.g., Yankton Sioux Tribe v. U.S. Dep't of Health & Human Services, 869 F. Supp 760, 765 (D.S.D. 1994) (distinguishing Lincoln in case involving alleged failure to comply with statute requiring tribal consultation before expending IHS construction funds).  Thus, the court finds that the BIA decision to restructure is subject to judicial review.

## B.      Statutory Construction of 25 U.S.C. § 2011(b)(1) and (2)

Standard principles of statutory interpretation do not have their usual force in Indian law cases.  Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 767, 105 S. Ct. 2399, 85 L. Ed. 2d 753 (1985).  The court must construe statutes liberally in favor of Indians, with ambiguous provisions interpreted in their favor.  Id.  The canons of construction applicable in

14

Indian law are based on the unique trust relationship between the United States and Indian Tribes.  Id.  The court must construe federal statutes liberally in favor of the tribe and interpret ambiguous provisions to the tribe's benefit.  See Hagen v. Utah, 510 U.S. 399, 411, 114 S. Ct. 958, 127 L. Ed. 2d 252 (1994).

It is the policy of the United States, acting through the Secretary of the DOI, to facilitate Indian control of Indian affairs in all matters relating to education.  25 U.S.C. § 2011(a).  Section 2011(b)(1) provides that all actions under the Education Amendments of 1978 shall be done with active consultation with the tribes, in a government-to-government relationship.  "Consultation" is defined as "a process involving the open discussion and joint deliberation of all options with respect to potential issues or changes between the Bureau and all interested parties."  25 U.S.C. § 2011(b)(2)(A).  Interested parties (including tribes and school officials) shall be given an opportunity:

> (i) to present issues (including proposals regarding changes in current practices or programs) that will be considered for future action by the Secretary; and
>
> (ii) to participate and discuss the options presented, or to present alternatives, with the views and concerns of the interested parties given effect unless the Secretary determines, from information available from or presented by the interested parties during one or more of the discussions and deliberations, that there is a substantial reason for another course of action.

25 U.S.C. § 2011(b)(2)(B).

15

Pursuant to Executive Order 13175, the BIA adopted a government-to-government consultation policy for proposed federal actions affecting tribes.  <u>BIA Consulting Policy</u>.  It includes the following definition of consultation:

> "Consultation" means a process of government-to-government dialogue between the Bureau of Indian Affairs and Indian tribes regarding proposed Federal actions in a manner intended to secure meaningful and timely tribal input.  Consultation includes that Indian tribes are:
>
> 1.     to receive timely notification of the formulated or proposed Federal action;
>
> 2.     to be informed of the potential impact on Indian tribes of the formulated or proposed Federal action;
>
> 3.     to be informed of those Federal officials who may make the final decisions with respect to the Federal action;
>
> 4.     to have the input and recommendations of Indian tribes on such proposed action be fully considered by those officials responsible for the final decision; and
>
> 5.     to be advised of the rejection of tribal recommendations on such action from those Federal officials making such decisions and the basis for such rejections.
>
> Consultation does not mean merely the right of tribal officials, as members of the general public, to be consulted, or to provide comments, under the Administrative Procedures Act or other Federal law of general applicability.

<u>BIA Consulting Policy</u>.

Agency action taken without statutory authorization, or which frustrates the congressional policy which underlies a statute, is invalid.

16

Oglala Sioux Tribe of Indians v. Andrus, 603 F.2d 707, 715 (8th Cir. 1979).

An agency must comply with its own internal policies even if those are more

rigorous than procedures required by the APA.  Id. at 713 (citing Morton v.

Ruiz, 415 U.S. 199, 235, 94 S. Ct. 1055, 39 L. Ed. 2d 270 (1974)).  Where

the BIA has established a policy requiring prior consultation with a tribe,

and therefore created a justified expectation that the tribe will receive a

meaningful opportunity to express its views before policy is made, that

opportunity must be given.  Lower Brule Sioux Tribe v. Deer, 911 F. Supp.

395, 399 (D.S.D. 1995) (citing Oglala Sioux Tribe, 603 F.2d at 721).  See

also Winnebago Tribe of Nebraska v. Babbitt, 915 F. Supp. 157, 163 (D.S.D.

1996) (holding that the BIA has the discretion to terminate employees, but

must consult with tribe first).

Both Congress and the BIA have articulated a policy that mandates

consultation between the BIA and the tribes in all matters affecting

education.  According to BIA's policy, that consultation includes the right to

be informed of the potential impact of the proposed federal action on the

tribes.  By law, consultation requires open discussion of all potential issues

or changes between the BIA and the Tribes.  25 U.S.C. § 2011(b)(2)(B).

There is evidence in the record that indicates that plaintiffs were unable to

meaningfully comment on the potential impact of the proposed

restructuring on the tribes and tribal schools because the BIA did not

inform the tribes that the money for the restructuring would be reprogrammed from the Indian School Equalization Program (ISEP)[2] funds and the Early Childhood Development[3] funds.  Both funds are used at the local level to provide programs that in the Tribe's view are important educational opportunities for children and their parents.

According to the evidence received at the preliminary injunction hearing, during the August 30, 2005, tribal consultation in Aberdeen, South Dakota, Acting Deputy Director of School Operations, David Talayumptewa, informed the tribes that an additional $5 million would be required for the restructuring, that the money would be requested from Congress, and that it "will not come from the schools."  Pl. Ex. 8 at 82-83.  On December 21, 2005, however, OIEP submitted a request to Congress to reprogram $1.5 million of ISEP funds to fund the realignment.  And on July 3, 2006, OIEP submitted a request to Congress to reprogram an additional $3.2 million in

---

[2]ISEP funds, as described in the 2007 budget justification, are allocated to "provide resources for special projects, new activities, and other costs.  This program funds non-traditional programs designed to involve at-risk students in education and to encourage more parental participation in schools."  Def. Ex. D at 13.  According to Deborah Bordeaux, the principal of Loneman School, unused ISEP funds are usually distributed to schools at the end of the school year and are an important source of funding for Indian schools.

[3]Early Childhood Development Funds are used to fund the Family and Child Education (FACE) program which provides early childhood education for pre-school Indian students, parenting skills for their families, and adult education at the tribal level.

Early Childhood Development funds to pay for the realignment.  Chairman
Frazier testified during the preliminary injunction hearing on July 7, 2006,
that he was not aware that OIEP intended to use ISEP funds for
restructuring until the day of the hearing, and that he had been told during
the 2005 consultation meeting that no school funds would be used.
Parisian conceded that the tribes were never informed that OIEP would be
requesting the reprogramming of ISEP funds to pay for the restructuring
and defendants do not allege that they informed the tribes that they would
be funding the proposed restructuring with Early Childhood Development
funds.

Because defendants did not notify the tribes that the proposed
restructuring could result in the loss of funding to Indian schools, plaintiffs
have demonstrated that they are likely to succeed on their claim that the
BIA failed to inform the tribes of the potential impact of the proposed federal
action, in violation of the BIA's government-to-government consultation
policy and 25 U.S.C. § 2011(b)(2)(B).  Although defendants held three
rounds of consultation meetings, plaintiffs can likely show that OIEP
informed them that the proposal would not divert funds away from schools,
and later requested reprogramming of ISEP funds and Early Childhood
Development funds budgeted for Indian schools, which does divert funds
away from schools.  This is not the meaningful consultation required by BIA

19

policy.  "Fair notice of agency intentions requires telling the truth and keeping promises."  Lower Brule Sioux Tribe, 911 F. Supp. at 399.  The BIA's alleged failure to comply with its own consultation policy violates general principles that govern administrative decisionmaking.  See Oglala Sioux Tribe, 603 F.2d at 721.

Construing the statute liberally in favor of the Indians, an open discussion of a proposal to reorganize Indian school administration must include a candid discussion about what funds will be used to pay for the reorganization.  Accordingly, this factor weighs in favor of granting a preliminary injunction so that OIEP can comply with the BIA's consultation policy.  In finding that plaintiffs are likely to prevail on their claim that the BIA failed to meaningfully consult with them before reorganizing its ELO management structure, the court expresses no opinion as to the propriety of the substantive aspects of the proposed restructuring.

## C.    Authority to Reprogram Funds

Plaintiffs contend that the reprogramming violates the school funding procedures set forth in 25 U.S.C. §§ 2005, 2007, 2008-2010 and 2012, and violates the reprogramming procedure detailed in the Conference Report for the appropriations act.  An agency's distribution of a lump sum appropriation is committed to agency discretion by law and is not subject to judicial review.  Lincoln, 508 U.S. at 192-93.  An agency has implied

authority to manage its funds.  Thompson v. Cherokee Nation of Oklahoma, 334 F.3d 1075, 1085 (Fed. Cir. 2003).  Unless there is a specific statutory limitation on the use of a lump sum appropriation, or specific restriction in other legislation, an agency is not restricted in its ability to reprogram.  Id. Appropriations acts typically provide that funds allocated to a program are "not to exceed" a certain amount.  Id. at 1084.  Under the plain meaning of the phrase, it is understood that the phrase "not to exceed" establishes a maximum earmark but not a minimum.  Id. at 1085.  See also 2 United States General Accounting Office, Principles of Federal Appropriations Law, p. 6-4 (2d ed. 1992), 1992 WL 700349 (G.A.O.).

In the Department of the Interior, Environment, and Related Agencies Appropriations Act of 2006, Congress authorized "$1,991,490,000, to remain available until September 30, 2007 . . . of which not to exceed $464,585,000 for school operations costs of Bureau-funded schools and other education programs shall become available on July 1, 2006, and shall remain available until September 30, 2007 . . ."  Pub. L. No. 109-54, 119 Stat. 499, 513-14 (2005).  Both parties agree that the ISEP funds at issue are part of the appropriation for school operations that is not to exceed $464,585,000.  Accordingly, the only binding authority in the appropriation act on ISEP funds is that spending on ISEP is capped at $464,585,000.

Relying on 25 U.S.C § 2005(f), plaintiffs contend that funds distributed to schools to cannot be transferred to management functions. Section 2005(f) provides that "all funds appropriated to the budget accounts for the operations and maintenance of Bureau-funded schools shall be distributed by formula to the schools.  No funds from these accounts may be retained or segregated by the Bureau to pay for administrative or other costs."  This section applies to facilities construction and the operations, repairs, and maintenance of those facilities.  25 U.S.C. § 2005.  Plaintiffs have not alleged that defendants transferred funds from the budget accounts for facilities to pay for the restructuring plan.  Thus, plaintiffs have not made a showing that this statute was violated.

Plaintiffs next allege that defendants violated 25 U.S.C. § 2007, which establishes an allotment formula for BIA school funding.  Pursuant to 25 U.S.C. § 2007(d), 1 percent of the funds available for allotment may be retained by the Secretary of the DOI for emergencies, to be used at the discretion of the director of the OIEP.  Funds reserved under this subsection may be spent on education services or programs, including emergency repairs of educational facilities.  25 U.S.C. § 2007(d)(2).  When the Secretary makes these funds available, the Secretary shall report the expenditure to Congress with the annual budget submission.  25 U.S.C. § 2007(d)(4).  Plaintiffs contend that because Congress did not appropriate additional

funds for the restructuring, defendants must be using funds appropriated for education.  The evidence presented to the court regarding the sources of the reprogramming funds, however, does not support this allegation.

Plaintiffs allege that defendants violated 25 C.F.R. § 38.4, which is entitled "Education positions."  It requires the director to establish the positions necessary to carry out the Bureau's education function.  Id.  The regulation provides that no position will be established for which funds are not available.  25 C.F.R. § 38.4(1).  Plaintiffs contend that defendants violated it by creating new positions that have not been funded.  Under § 38.3, an education position "means a position in the Bureau the duties and responsibilities of which: (a) are performed on a school term basis principally in a Bureau elementary and secondary school which involve: (1) Classroom or other instruction or the supervision or direction of classroom or other instruction . . ."  Thus, the ELO and SES positions are not "education positions" as defined by the regulations because they are management positions located in offices, not classrooms.  Accordingly, 25 C.F.R. § 38.4 is not applicable to this case.

Plaintiffs contend that defendants have not provided information that shows that they did not violate 25 U.S.C. § 2012 (which covers education personnel), § 2007(d) (emergency funding), § 2008 (administrative cost grants for tribes and tribal organizations), and cannot show that they did

23

not violate the Snyder Act of 1921.  Moreover, plaintiffs contend that defendants have failed to provide information showing that they did not violate 25 C.F.R. § 39.79 (which regulates the expenditure of contingency funds set aside for natural disasters and other emergencies) or § 39.122 (which provides a formula for allocating education administrative funds). The court has reviewed the statutes and regulations cited by plaintiffs, and finds that plaintiffs are unlikely to succeed on the merits of their claims that the reprogramming violated statutes and regulations related to Indian school funding.

Plaintiffs contend that defendants violated the reprogramming procedures outlined in the House Conference Report for the 2006 appropriation.  Pursuant to the guidelines, "reprogramming should be made only when an unforeseen situation arises; and then only if postponement of the project or the activity until the next appropriation year would result in actual loss or damage."  H.R. Rep. No. 109-188, at 69 (2005) (Conf. Rep.). Reprogramming should not be used to start new programs or change allocations specifically denied.  Id. at 70.  Parisian testified at the hearing that the restructuring was not an unforeseen event and had been planned for many years.  Because this limitation on reprogramming appears in the conference report, and not the legislation appropriating the funds, it is not

24

legally binding.  See Thompson, 334 F.3d at 1085.  Accordingly, plaintiffs are unlikely to succeed on the merits of this claim.

**D.    Rural Preference**

Plaintiffs contend that the relocation of ELOs from small reservation communities to Rapid City, Pierre and Minot violates the DOI's rural preference policy for locating offices.  The DOI Departmental Manual describes the DOI's policies for relocating or establishing its first-level field offices.  DOI Department Manual Part 101, Chapter 3 available at http://elips.doi.gov/elips/release/3607.htm.  The DOI policy requires that first priority be given to locating offices in rural areas, which are defined as "any area other than a city or town that has a population of greater than 50,000 inhabitants, and/or the urbanized area contiguous and adjacent to such a city or town."  Id.  An agency must comply with its own internal procedures.  See Oglala Sioux Tribe, 603 F.2d at 713.

Parisian testified that the ELOs are first-level field offices.  He also stated that he was not aware of the DOI rural preference policy.  Defendants presented no evidence showing that the rural preference policy was considered when Rapid City was selected as an ELO location.  Rapid City has a population greater than 50,000.  Because Parisian testified that he was unaware of the policy, and one of the proposed new offices will be located in town with a population greater than 50,000, plaintiffs have

25

demonstrated that they have a fair chance of succeeding on their claim that the restructuring would violate the DOI's rural preference policy.

### E.    Equal Protection

Plaintiffs contend that the proposed restructuring violates their constitutional right to equal protection.  Courts should avoid constitutional questions unless the issue is unavoidable.  Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 223 F.3d 873, 886 (8th Cir. 2000).  Because the court can decide whether to grant the preliminary injunction based on alleged violations of federal statutes, regulations and violations of BIA internal policies, the court will not consider the constitutional claim.

### 4.    Public Interest

"It is the policy of the United States . . . to work in full cooperation with tribes toward the goal of ensuring that the programs of the Bureau of Indian Affairs-funded school system are of the highest quality . . ."  25 U.S.C. § 2000 (emphasis added).  The BIA must engage in active consultation with the tribes in matters related to Indian schools.  See 25 U.S.C. § 2011(b).  Because the public interest favors meaningful consultation between the federal government and Indian tribes regarding policy actions that affect Indian education, this factor supports granting the motion for preliminary injunction.  Thus, the court finds that plaintiffs have

satisfied the four <u>Dataphase</u> factors to the extent necessary to support a preliminary injunction.

**5.     Bond**

Defendants requested that plaintiffs post a bond in the amount of $200,000.  The court may not issue an injunction without requiring the applicant to give security for the payment of costs incurred by any party found to have been wrongly enjoined.  <u>See</u> Fed. R. Civ. P. 65(c).  The amount of the bond required by Rule 65(c) rests with the discretion of the court. <u>The Rathmann Group v. Tanenbaum</u>, 889 F.2d 787, 789 (8th Cir. 1989). Defendants did not present evidence related to costs that they will incur if it is later found that they were wrongly enjoined, but the court has ordered them to continue employing some lower level staff members they intended to terminate.  Evidence was presented that the restructuring will cost an additional $5 million annually and will include 7 new highly paid SES positions.  Accordingly, the court finds that if defendants incur costs as a result of being wrongly enjoined, these costs will be more than offset by delaying the restructuring and hiring of the new SES positions.  Thus a minimal bond in the amount of $1,000 is appropriate.  Accordingly, it is hereby

ORDERED that plaintiffs' motion for a preliminary injunction (Docket 1) is granted.

27

Defendants are hereby enjoined from carrying out the proposed restructuring plan as it affects plaintiffs.  Defendants are enjoined from closing the ELOs in Eagle Butte, Mission, Lower Brule and Pine Ridge, South Dakota, and Fort Yates and Belcourt, North Dakota.  Defendants are enjoined from opening ELOs in Rapid City and Pierre, South Dakota, and Minot, North Dakota.  Defendants are enjoined from taking any personnel action related to restructuring the ELOs in the Dakotas.

Defendants are also hereby enjoined from filling new ELO or SES positions as contemplated in the restructuring plan.  Defendants shall not spend any funds remaining from the $1.5 million reprogramming of ISEP funds on any aspect of the proposed restructuring plan that affects positions in the Dakotas.  Defendants shall not spend any portion of the $3.2 million in Early Childhood Development funds on any aspect of the proposed restructuring plan that affects the Dakotas, including but not limited to the new ELO and SES positions.

IT IS FURTHER ORDERED  that plaintiffs post a security bond in the amount of $1,000.

Dated July 14, 2006.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

28